UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBERT LEADUM | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | Civil Action No. |
| v. | ) | 3:01-CV-01779 (TPS) |
| | ) | |
| LABORERS' INTERNATIONAL UNION | ) | |
| OF NORTH AMERICA, LOCAL 675 | ) | November 13, 2003 |
| | ) | |
| *Defendant* | ) | |

## LIST OF ATTACHED EXHIBITS REFERRED TO IN:

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Exhibit 1**    **ADEA COMPLAINT**
**Filed by Plaintiff on 9/17/01**

**Exhibit 2**    **Affidavit of Local 675 Business Manager Richard Beckenbach**

**Exhibit 3**    **Letter from Kiewit Construction Company detailing Mr. Leadum's**
**termination from employment**

**Exhibit 4**    **Steward's Daily Work Report (written by Anthony Garcia)**
**Re: Plaintiff's employment with Kiewit Construction Company**

**Exhibit 5**    **Letter from Camputaro detailing Mr. Leadum's**
**termination from employment**

**Exhibit 6**    **Member Hours for Leadum**

**Exhibit 7**    **Affidavit of Jimmy V. Ribeiro**

**Exhibit 8**    **Resignation Letter from Leadum sent to Union January 26, 2001**

**Exhibit 9**    **Leadum's Union Initiation Card**

**Exhibit 10**    **Deposition of Local 675 Business Manager Richard Beckenbach**
**Pages 23-24, 38, 44-50, 76**

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**
COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

Submitted by,

By: _____
John T. Fussell, Esq. and
John M. Brown, Esq. of
ROBERT M. CHEVERIE &
    ASSOCIATES, P.C.
Commerce Center One
333 East River Drive, Suite 101
East Hartford, CT  06108-4201
Fed. Bar # ct 17989

# C E R T I F I C A T I O N

This is to certify that a copy of the LIST OF ATTACHED EXHIBITS REFERRED TO

IN: MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR

SUMMARY JUDGMENT was sent, first class and postage prepaid, this 13th day of November,

2003, to the following:

José Vivaldi Martinez, Esq.
60 Old New Milford Road, Suite 3D
Brookfield, CT  06804

_____
JOHN T. FUSSELL

JTF.LIUNA 675
List of Exhibits for Leadum Memo of Law 11-13-03

**ROBERT M. CHEVERIE & ASSOCIATES, P.C.**
COMMERCE CENTER ONE • 333 EAST RIVER DRIVE • SUITE 101 • EAST HARTFORD, CT 06108 • (860) 290-9610 • FAX (860) 290-9611 • JURIS NO. 405719

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FILED

ROBERT LEADUM     :     CIVIL ACTION # '01
    Plaintiff     :

VS.     :
    DOCKET NO.:

LABORER'S INTERNATIONAL UNION : 
OF NORTH AMERICA LOCAL 675     :     **JURY TRIAL**
    Defendant     :     **DEMANDED**

SEP 17  3 27 PM '01
U.S. DISTRICT COURT
NEW HAVEN, CONN.

**301CV01779 AVC**

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 1E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8453
JURIS NUMBER 414988

## COMPLAINT

### I.    Preliminary Statement

1)    This action seeks declaratory, injunctive and equitable relief, compensatory and punitive damages; and costs and attorney's fees for age discrimination; breach of contractual obligations; and intentional or negligent infliction of emotional distress suffered by Plaintiff in his treatment while employed by Local 675 of the Laborer's International Union of North America.

### II.    Jurisdiction

2)    This action arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* and the law of the State of Connecticut; Sections 46a-60(1), (3) and (4) of the Connecticut General Statutes.

3)    Jurisdiction over the federal issues is invoked pursuant to 29 U.S.C. § 621 *et seq.* and over the state law claims pursuant to the doctrine of pendent jurisdiction.

4)    Declaratory, injunctive, and equitable relief is sought pursuant to 29 U.S.C. § 621 *et seq.* and the pendent claims.

5)  Compensatory and punitive damages are sought pursuant to 29 U.S.C. §§ 216 and

217 and the pendent claims.

6)  Costs and attorney's fees may be awarded pursuant to 29 U.S.C. § 621 *et seq.* and

Fed. R. Civ. R. 54.

### III.    Parties

D.a.B.
3/27/31

7)  The Plaintiff, Robert G. Leadum, is a black male, 69 years of age.  He is a

resident of Connecticut and employed as a laborer for the Union.   At the time of

the claimed unlawful acts of the Defendant, Mr. Leadum was 69 years of age.

8)  Defendant, Laborers International Union (Union), is organized under the laws of

Connecticut.  The Union transacts business and performs services in Connecticut.

At all times, relevant to this civic action, Defendant was the employer of the

Plaintiff.

9)  The Union is an agent for several employers, each of which employer engages in

construction and employs 800,000 union members, in the United States and

Canada, on a regular basis.

10)  The Union is a labor organization, engages in an industry affecting construction,

maintains and operates a hiring list which procures employees for employers as

procures for employees the opportunity to work for an employer.  It has about

800,000 members of which over 500 are in Connecticut.

### IV.    Statement of Facts

11)  Plaintiff has been a member of the Union since July 14, 1999.

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 1E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8453
JURIS NUMBER 414988

12)    Mr. Leadum's general health is considered to be good and he has no medical conditions that interfere with his work duties.

13)    The Union has a policy, system, and procedure, that when an employee is laid off from a job, his/her name is placed on a list. The list is in chronological order to reflect that the employee laid off first appears first on the list and is therefore the first to be employed. It is policy that employees are referred from the list, and in the order they appear on the list.

14)    It is regulation that people who are laid off later, cannot be hired earlier than those above them on the list. This system provides that those who have been laid off the longest will be given first opportunity for early employment, after which the older employees are given opportunity.

15)    Plaintiff, a 69 year-old laborer, with 15 years of experience is one of the oldest in the region/city. Despite the system, Plaintiff noted that people in the Union hall, members of the Union, who were lower than he on the list, were being sent out for employment while he was not being sent out.

16)    On July 12, 1999, at 8:45 a.m., Plaintiff observed thirteen (13) people being sent out for work. Another individual was called at his home to report to work.

17)    Plaintiff was not allowed to attend training and school that the Union offered to laborers while younger members were sent.

18)    Two of the four men were between the ages of 20 – 25 years.

19)    It is also the Plaintiff's knowledge that these two men were authorized to attend training after the Plaintiff had been informed that there were no openings.

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 1E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8453
JURIS NUMBER 414988

20)   On July 3, 2000, the business manager, Mr. Richard Beckenback, inquired of the Plaintiff what his age was.

21)   Growing impatient, and feeling he was being discriminated against, on June 2000, Plaintiff, Robert Leadum, asked the business manager why he wasn't sent out to a contractor to work as a laborer on the I84 Interstate Highway project. The business manager responded to the Plaintiff that the work was too hard for him and that he did not want to see him have a heart attack.

22)   Due to the willful and unlawful discrimination, retaliation, and unfair treatment committed by the Laborer's International Union of North America, Local 675, Plaintiff has suffered and continues to suffer loss of income, retirement and other fringe benefits which would have accrued to him, and further, Plaintiff has suffered and continues to suffer emotional distress, mental anguish, and humiliation.

### V.    Causes of Action

A.    First Cause of Action

23)   Plaintiff incorporates as of realleges, Paragraphs 1 through 22.

24)   With regard to the Laborer's International Union of North America, Local 675's, treatment of Plaintiff, it has willfully violated the provisions of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.*.

B.    Second Cause of Action

25)   Plaintiff incorporates as of realleges, Paragraphs 1 through 22.

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 3E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8451
JURIS NUMBER 414988

26)   By failing to follow its own personnel policies and procedures on evaluating and

providing equal employment opportunity to its employees, the Laborer's

International Union of North America, Local 675, have breached their contractual

obligations to Plaintiff.

### C.    Third Cause of Action

27)   Plaintiff incorporates as of realleges, Paragraphs 1 through 22.

28)   By not allowing Plaintiff to enjoy the same treatment afforded to other Union

members and engaging in this practice of displacement, the Laborer's

International Union of North America, Local 675, have intentionally or, in the

alternative, negligently inflicted emotional distress on the Plaintiff.

### IV.    Prayer for Relief

29)   WHEREFORE, Plaintiff prays that this Court:

a)   Declare the Laborer's International Union, Local 675's, conduct is a

violation of his rights;

b)   Enjoin the Laborer's International Union, Local 675 from engaging in

such conduct;

c)   Award him back pay, prejudgment interest, and loss of fringe benefits;

d)   Award him compensatory damages of $250,000.00 for emotional distress,

mental anguish and humiliation;

e)   Award him liquidated damages in an amount to the back-pay assessment

pursuant to 29 U.S.C. § 626(b) incorporating 29 U.S.C. § 216 of the Fair

Labor Standards Act;

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 1E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8453
JURIS NUMBER 414988

f)  Award him costs, expert witness fees, and attorney's fees pursuant to 29

U.S.C. § 621 *et seq.*;

g)  Grant such other relief as it may deem just and proper.

### VI.    Jury Demand

30)  Plaintiff demands a jury to try all claims triable by a jury.

Respectfully Submitted,

September 14, 2001

BY:  _____

José Vivaldi Martínez
Attorney for the Plaintiff
60 Old New Milford Road, Suite 3D
Brookfield, CT 06804
Telephone:  (203) 775-8664
Federal Juris Number:  CT15393

LAW OFFICES OF
JOSÉ VIVALDI MARTÍNEZ
60 OLD NEW MILFORD ROAD, SUITE 3E
BROOKFIELD, CONNECTICUT 06804
(203) 775-8664    FACSIMILE (203) 775-8453
JURIS NUMBER 414988

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT LEADUM ) | |
| ) | |
| *Plaintiff* ) | |
| ) | Case No. 3:01-CV-01779 (TPS) |
| v. ) | |
| ) | |
| LABORERS' INTERNATIONAL UNION ) | October 14, 2003 |
| OF NORTH AMERICA, LOCAL 675 ) | |
| ) | |
| *Defendant* ) | |
| ) | |

## AFFIDAVIT OF RICHARD BECKENBACH

I, Richard Beckenbach, Business Manager for Laborers' International Union of North America ("LIUNA"), Local 675 ("Union"), understand the meaning of an oath and do hereby swear to the following:

1.    I have been a member of the Union since 1961 and have been Business Manager of Local 675 since 1965. The Union has approximately 260 members and employs myself as Business Manager and a part-time secretary.

2.    Local 675 ("Union") has jurisdiction over laborers work performed in the greater Danbury area. Local 675 is a party to the Heavy and Highway Collective Bargaining Agreement ("Agreement") between the Connecticut Construction Industries Association, Inc. ("CCIA") and the Connecticut Laborers' District Council of the Laborers' International Union of North America. The Agreement has a broad non-discrimination clause which specifically prohibits discrimination based on age (attached as Exhibit A).

3.    Laborers employed by Contractors signatory to the Heavy and Highway Agreement are beneficiaries of the terms and conditions of the Agreement and are paid the wages and fringe benefits scheduled in the Agreement.

4.    As set forth below, signatory contractors operating in the jurisdiction of Local 675 employ laborers by direct solicitation by members and non-members and/or through Local 675's hiring hall. In this regard, the Local Union is not an employer of the laborers it refers for employment to signatory contractors. The signatory contractor is the employer of the referred laborers.

5.     Local 675's hiring hall functions on a "non-exclusive" basis. The Local refers members and non-members indiscriminately.

6.     Laborers who wish to utilize the services of the Union's hiring hall request their names be listed on the referral board. The registered laborers are typically referred to signatory contractors as their names reach the top of the referral board. For example, if there were 49 laborers on the referral board and a laid off laborer not on the board requested placement on the board, this laborer would be added as No. 50 on the board. Generally, referrals to a requesting contractor are sent from the top of the board such that if a contractor needed five laborers, then laborers Nos. 1-5 would be referred and laborer No. 50 would move up to No. 45 on the board.

7.     Until recently, and at all times relevant to the above-captioned matter, the referral list was a magnetic board maintained in the Union Office such that any laborer utilizing the referral system could see his/her name ranking on the board and could self-monitor the referral progress.

8.     As a general rule, a signatory contractor in need of laborers and unable to fill such need, requests laborers through the Local Union's hiring hall. Generally, the Union's hiring hall system refers laborers registered at the hiring hall in response to a contractor's request on a first-in, first-out basis as described above in paragraphs 6 and 7. However, as described below, this is not always the case.

9.     Under the referral system, a contractor also has the right to make a request for laborers who possess special skills and are, therefore, paid a "premium rate" under the Heavy and Highway Agreement. For example, if a contractor needs only mason tenders and not general laborers, such contractor may request laborers on the list with mason tending skills. The Union will then refer such special skilled laborers on the list on a first-in, first-out basis. Therefore, if laborers 1-5 on the referral board were not mason tenders, such laborers would be passed over for that mason tending referral request. Similarly, if such laborers ranked on the list were not jackhammer/pavement breakers, they too would be passed over for a referral requesting laborers with 90-lb. jackhammer experience.

10.     The premium rates paid for special skills are identified in the Agreement. For example, under the terms of the Agreement, mason tenders earn a 50-cent per hour premium. Similarly, laborers capable of performing "Jack Hammer/Pavement breaker (handheld)" earn a 50-cent per hour premium.

11.     Under the Union's referral system, self-solicitation for employment is optional. Therefore, a laborer is not restricted to utilize the Union's referral system to obtain work with a signatory contractor. In addition to placing his name on the referral list, a laborer may go directly to a hiring signatory contractor and seek employment on his own initiative without waiting for a referral from the hiring hall.

12.    Plaintiff Robert Leadum ("Mr. Leadum") first joined the Union on July 14, 1999 and thereafter requested placement on the referral board. At that time, Mr. Leadum, born March 27, 1931, was 68 years old.

13.    Mr. Leadum was initially referred to a position at the Waterbury Masonry Foundation in July 1999. He retained that job until early August 1999. His primary responsibility at that position was to assist the brick masons on-site.

14.    The second referral Mr. Leadum accepted was to the Kiewit Construction Company in late August 1999. He retained that job until mid-November 1999. His primary responsibility while employed by Kiewit was to serve as the foreman of a crew responsible for building a silt fence.

15.    The third referral Mr. Leadum accepted was to BBL-Carlton, LLC in December 1999. He retained that job until early February 2000. His primary responsibility at that position was, again, to assist the on-site brick masons.

16.    The final referral Mr. Leadum's accepted was to Camputaro Leasing, LLC in September 2000. He retained that job for only two days. His primary responsibility at that position was to work with a 60-lb. jackhammer (see Paragraph 19, below).

17.    Mr. Leadum's performance history was not stellar. While engaged at the Kiewit Construction Company job, Mr. Leadum encountered a few incidents which gave rise to a concern over Mr. Leadum's employment experience, skills, and desire to be there – including damaging one of the employer's trucks, loading hay not only into the bed of a truck, but also into the back seat of such truck, arguing with a female member of his crew about her ability to share the cab of his truck because of his concern about being brought up on sexual harassment charges, spending over a week away from the job due to illness, and having what might unscientifically be described as a nervous breakdown after subordinates disregarded his orders out of safety concerns. After this latest incident, which was apparently very upsetting to Mr. Leadum, he requested a layoff from the jobsite superintendent. This was initially discouraged by the jobsite superintendent, but was ultimately granted after Mr. Leadum took the weekend off to consider his request and still desired the layoff (effective November 1999). Mr. Leadum spent a total of 517.5 hours employed by Kiewit Construction Co.

18.    Mr. Leadum's next position at BBL Carlton was also terminated early due to his request to be laid off. He felt that the temperature at the job site was too cold for his comfort. Mr. Leadum spent a total of 216 hours employed by BBL Carlton, LLC.

19.    Mr. Leadum's last position with Camputaro & Sons was terminated after only two days of employment. His first day was Thursday, September 21, 2000. He operated a 60-lb. jackhammer for approximately 9.5 hours that day. That evening, Mr. Leadum ended up in the Danbury Hospital Emergency Room and was advised to avoid all 'heavy work' until at least October 21, 2000. He returned to Camputaro the next morning and was assigned "light duty" work. At the end of the day, he was asked by Camputaro to

return the following day (Saturday). He agreed to do so. After not showing up on Saturday or Monday morning, Camputaro terminated Mr. Leadum. Mr. Leadum spent a total of 18 hours employed by Camputaro Leasing, LLC.

20.    Mr. Leadum was offered multiple referral opportunities between the time he was laid off by BBL Carlton, LLC (December 1999) and the time he requested to be removed from the referral board (January 26, 2001). Specifically, he was offered opportunities with the Kiewit Construction job on the following days during the year 2000: March 3rd, March 13th, May 3rd, July 5th, July 7th, July 10th, July 19th, and July 25th. His response to my suggestion that he take these opportunities was, "I'd rather not."
Mr. Leadum was also offered and declined a laborer's position with C.H. Nickerson in July 2000, but declined the referral in favor of Jimmy Ribeiro. Mr. Leadum stated that Jimmy Ribeiro was a "young laborer with a family who needs the money more". Mr. Leadum refused the final union referral by letter dated January 26, 2001, requesting in that letter that he be removed from the referral board.

21.    Rather than accept referrals, Mr. Leadum frequently came down to the Union Hall and hung out and drank coffee. Frequently, Mr. Leadum and I would converse as I performed my duties at the Union Office and administered the referral board in response to contractors' requests for laborers.

22.    Based upon these discussions and Mr. Leadum's recent experience in the field as a laborer, I came to doubt Mr. Leadum's claim that he had 15 years of experience as a laborer as he represented when he registered for job referrals. For example, Mr. Leadum did not even understand the term "silt fence" and, when instructed to put up a silt fence, asked what one was.

23.    Prior to the alleged discrimination in connection with the I-84 job referral at issue in ¶ 25 of the Complaint, Mr. Leadum never identified any experience as a "Jack Hammer/Pavement breaker" and never expressed any interest in this difficult work. In addition, the individuals in paragraph 28 were the only ones from Local 675 to attend training during the 18 months Mr. Leadum was a member.

24.    The job of pavement breaking with a 90-lb. jackhammer, in addition to being physically demanding, requires a highly skilled, experienced laborer. As Business Manager since 1965, in my opinion, between 75-80% of the members of the Local, regardless of age, do not have the skill and ability to perform this work.

25.    On or about July 5, 2000, Mr. Leadum was at the Union Hall when I received a request from DeFelice Construction Company for four experienced Heavy and Highway laborers to perform pavement-breaking work with 90-lb. jackhammers on the I-84 project. I referred the next four experienced laborers on the referral board consistent with the referral procedures. The four laborers referred to this job were ahead of Mr. Leadum on the referral board. These four laborers had all previously received training on the proper use of 90-lb. jackhammers for Heavy and Highway pavement breaking work. Mr. Leadum did not have a basis to protest the referrals given his rank on the referral board and his lack of demonstrated experience with a 90-lb. jackhammer.

26.    The next day, after the four laborers had been referred to the I-84 job, Mr. Leadum asked why he wasn't sent to the job. I was surprised by his request because of the nature of the work (90-lb. jackhammer pavement breaking on I-84 during the month of July). Mr. Leadum had never before indicated any experience with or desire to perform such work. I was also surprised because the laborers referred to the job were ahead of Mr. Leadum on the referral board, a fact that Mr. Leadum could plainly see and never contested.

27.    The Union can refer laborers to training classes when openings are available. During the time that Mr. Leadum was a member of the Union, he approached me on one occasion to discuss the option of attending training sessions available through the Union. At that time and in Mr. Leadum's presence, I contacted the Union training academy to inquire about any openings. There were no available slots and, therefore, Mr. Leadum was not able to attend the training session.

28.    Subsequently, I inquired via telephone, in Mr. Leadum's presence, about openings for a training class for two potential laborer apprentices. Openings for laborer initiation classes were then available and these two potential apprentices were able to attend the training sessions. Mr. Leadum expressed dismay for being, as he saw it, passed over in favor of two recent high-school graduates. However, until receiving a copy of Mr. Leadum's CHRO complaint, I thought my explanation offered to him at that time, that the training class was designed to introduce the uninitiated to the construction industry, was sufficient to explain why I didn't think of him for the class. Mr. Leadum claims to have over 15 years of laborer experience. He wasn't going to benefit from an introductory class about the construction industry. It would have been a waste of his time.


_Richard Beckenbach_                          _10/14/03_
Richard Beckenbach                             Date


STATE OF CONNECTICUT
                                    ss.
COUNTY OF HARTFORD

    Before me, the undersigned Notary Public, this _14th_ day of _October_, 2003, personally appeared Richard Beckenbach, to me known, who being duly sworn by law, deposes and states that the above representations are true to be the best of his knowledge and belief.


_Karen M. Dauphinais_                     _October 14 2003_
Notary Public                             Date

**KAREN M. DAUPHINAIS**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2007

## HEAVY AND HIGHWAY AGREEMENT

between the

## CONNECTICUT CONSTRUCTION INDUSTRIES ASSOCIATION, INC.

and the

## CONNECTICUT LABORERS' DISTRICT COUNCIL OF THE LABORERS'

## INTERNATIONAL UNION OF NORTH AMERICA

---

THIS AGREEMENT, is made and entered into on this 1st day of April 1999, by and between the Connecticut Construction Industries Association, Inc. (hereinafter referred to as the "Association") acting for and on behalf of those employers it has been or will be authorized to represent and has agreed or will agree to represent, and such other contractors who execute an Acceptance of the Terms and Provisions of this Agreement (only if such contractor(s) are contributors to and are not delinquent in their payments to the CCIA's Association Construction Industries Program) (each of which is hereinafter referred to as the "Employer"), in their dealings with the Council or the Union or both, as herein defined, and the Connecticut Laborers' District Council of the Laborers' International Union of North America, AFL-CIO (hereinafter referred to as the "Council"), acting for and on behalf of all its affiliated local unions located in the State of Connecticut: 56 -Greenwich; 146 - Norwalk; 230 - Hartford; 390 - Waterbury; 449 - Stamford; 455 - New Haven; 547 -New London; 611 - New Britain; 665 - Bridgeport; and 675 - Danbury; and their successors and assigns (each of which is hereinafter referred to as the "Local Union or Unions"), and which cover the entire State of Connecticut. The Council and the Local Union or Unions shall be collectively referred to herein as the "Union".

### PREAMBLE

The purpose of this Agreement is to determine the hours, wages, fringes, and other conditions of employment, and to adopt measures for the settlement of differences and to maintain a cooperative relationship so that the contractors may have sufficient capable workers and the workers may have as much continuous employment as possible, without interruption by strikes, lockouts, or other labor-management troubles.

NOW, THEREFORE, the undersigned Association and the Union, in consideration of the mutual promises and covenants herein contained agree as follows:

## PROTECTION OF RIGHTS

There shall be no discrimination against any employee by reason of race, creed, color, sex, or national origin, age, disabilities, reasonable accommodation to disabilities under the Americans with Disabilities Act, union or concerted activities or membership or non-membership in the Union. The Employer, the Union, and the Employees shall abide by the Federal Williams-Steiger Occupational Safety and Health Act and other applicable safety regulations of Connecticut. The Employer may decline to arbitrate grievances dealing with the above matters unless the parties and the employee(s) enter into an agreement which provides: (1) that the Employer shall not discriminate; (2) the statutory issues are covered by this Agreement and will be arbitrated; and (3) that employee(s) are waiving their right to go to an administrative agency or court and, further, this agreement results in the arbitration hearing being final and binding.

## ARTICLE I
## TERRITORIAL JURISDICTION

This Agreement shall apply to and be effective within all areas of the State of Connecticut.

## ARTICLE II
## UNION RECOGNITION, UNION SECURITY, AND EMPLOYMENT

SECTION 1.    The Employer hereby recognizes and acknowledges that the Union is the exclusive representative of all employees in the classifications and categories of work covered by this Agreement for the purpose of collective bargaining as provided by the Labor-Management Relations Act of 1947, as amended.

SECTION 2.   All present employees who are members of the Union on the effective date of this Agreement shall remain members in good standing by the payment of their regular monthly dues as a condition of continued employment.   All present employees who are not members of the Union and all employees who are hired hereafter for work in the classifications specified herein shall become and remain members in good standing by the payment of the required initiation fee and regular monthly dues on the 8th day following the execution of this Agreement or the date of employment, whichever is later, and shall thereafter maintain such good dues standing for the term of this Agreement.

SECTION 3.   Upon receipt of written notice from the Local Union, the Employer shall discharge any employee who fails to become or is not a member of the Union on the prescribed day, provided membership was available under the same terms and conditions as generally applicable to other members. Further, all employees who fail to maintain their Union membership in good dues standing shall be summarily discharged by the Employer. The Union agrees to indemnify, defend, and hold the Employer harmless from any claim arising from any such discharge.

SECTION 4. "Membership in good standing" as referred to herein means solely the tender or payment of normal dues and the standard initiation fee.

2

# *Kiewit Construction Company*
## Level 3 – Danbury CT



DEFENDANT'S
EXHIBIT NO. 8
FOR IDENTIFICATION
10-8-02
DATE:     RPTR: MAG

October 4, 2000

Mr. Richard Beckenbach
Business Manager
Laborers International Union of North America – LOCAL # 675
7 Harmony Street
Danbury, CT 06810

Subject:     Robert Leadum – Labor Foreman

Dear Dick:

This letter is to detail the termination of Mr. Robert Leadum, who was employed by Kiewit Construction Company as a Labor Foreman at our Level 3 / Danbury operation.

Mr. Leadum was laid off at his own request in the fall of 1999.

When Mr. Leadum approached me and the project labor steward, Mr. Tony Garcia, requesting a layoff due to personal problems, I offered to Mr. Leadum to take some time off and get whatever he needed straightened out and come back to work when he was ready. Our job was scheduled to work through the winter months and scheduled to finish in the summer of the year 2000. If in fact Mr. Leadum had remained in our employment that probably would have been the potential of another 6 – 8 months of available work.

Mr. Leadum remained adamant that he wanted laid off so we proceeded accordingly.

In all honesty and as a fact, I feel that Mr. Leadum left of his own volition and at his own request.

If you or anyone else has any questions please feel free to contact me at 1-009-487-6820.

Sincerely,

David R. Wiley Sr.
General Superintendent / Kiewit Construction Co. – Level 3 Danbury CT Office

Kiewit Construction Company
16 Trotter Drive Medway, Massachusetts 02053
Phone (508) 533-1400  Fax (508) 533-1425

the Shop Steward Daily Work Report
Sheets for the Kiewit Project
1999, thru 2000 On Robert Leadum,

Kiewit Construtars
21 old Sherman Turnpike
Danbury Ct
Level III Project

Anthony Garcia - steward
Book # 8472678

Project Manager - ~~~~~~~
        ERIK Gundel
General Superintendent -
        Dave Wiley

Fore Man : Robert Leadum

Hired on 8/20/99

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

## Robert Leadum

8/30/99 worked 5 hrs - Sick

9/25/99 - He Did Damage on a Kiewit Crew Cab Truck Ripped the Door on Passenger Side it was His Fault because He chd not use Sameone to Back up the Truck - Policy You have to use Sameone backing you up. He never told any one about it and then Told the Super 3 Days Latter.

9/27/00 - missed work - sick

10/15/00 - Missed work - sick

10/19/00 - Incident with Robert Leadum with Judy

ON Silt Fence crew
Judy wanted a Ride
with the crew so that
she Sat in the middle
of the Truck. Robert told
Her to get out of the
Truck Because He did
not want to Touch her
so that she would not
throw a Sexual Harrasment
Suit against him He was
very verbial to her about
Touching her. Joe Hubert
was also there told Robert
that He will sit In middle
and Judy will sit outside
Robert still argued about
Cuttea C

about it and also
called the Bussiness Dept
I ended up Putting Judy
In the yard Because
of Robert! did not want
Her on His crew.

10/29 - need Time off work
To straynten out Eviction
Notice on Apartment.

Jan - 2000

11/2 - missed work - sick
11/3 - missed work - sick
11/4 - worked 4hrs Note of sick from VAHop    From VAHop
11/5 - missed work sick
11/6 - missed work sick
11/8 - missed work sick
11/9 - missed work sick
11/10 - missed work sick

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

11/12 problems with Robert
and Joe Hubert with
the Hand Radio that
Joe told the Driver of
the Roll off Truck to
stop Because a Reel
was Jumping out of
the sled and when that
Happens it could Come
out and land on top
of a Car so Joe was
trying to stop the Truck
Robert Could not see the
Reels from where he
was standing. Both
Joe and Mark RU/ther
was Yelling to stop

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

the truck and
Robert was Telling
the Truck Driver Keep
Going, Finally Joe Ran
up to the Truck Told
the Driver to stop.
Which He did. Robert
told Joe He Had no
Right to stop the truck
that He was the foreman
and He Had no say about
what goes on. Joe Told
Him when it Comes to
safety its His problem
Robert kept on telling
Both Joe & Mark that
He is the Boss and
He Could Fire them.

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

Robert was Yelling at
top of His Lungs Im
the Boss Im the Boss
and Jumpping up & Down
Joe said He look like
He was Loosing It
So He told him To Tie
Tie wraps are still
He was Tying them
Back wards and got
Behind So Set that
It slowed Down the
process when He came
Back to the yard, my
Self and General superintendant
told him to Take off
the weekend and Take

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

it Easy , then Came Back
if He wanted to work
or we Could give Him
a Layoff Slip if He
wanted it.

11/15 Robert Took a
Layoff Slip a
Good Layoff Slip
and Robert did not
get Fired like He
Claimed.

HAVE YOU MADE YOUR VISUAL INSPECTIONS TODAY?

# Ralph Camputaro & Son INC.

DEFENDANT'S
EXHIBIT NO. 7
FOR IDENTIFICATION
10-8-02
DATE: _____ RPTR: AMG

### EXCAVATING
### TRUCKING -- BACKHOE -- BULLDOZING
### TREES CUT -- LOTS CLEARED -- DEMOLITION

**1 ENTERPRISE DRIVE**
**NORTH BRANFORD, CT 06471**

TEL. (203) 483-0330
FAX  (203) 483-7518

October 27, 2000

Local 675
7 Harmony Street
Danbury, CT  06810

Attention:  Richard Beckenbach

RE:  Robert Leadum

Dear Mr. Beckenbach:

On September 21, 2000 Mr. Robert Leadum showed up for work at our job site in Southbury.  He operated a sixty pound jack hammer for most of the 9-1/2 hours he worked that day.

He went to the Danbury hospital sometime after work on 9/21/00 for a blister on his right hand.  Paperwork indicates light duty until Monday, 9/25/00.

Mr. Leadum showed up for work on Friday, 9/22/00 and worked 8-1/2 hours on clean up duty on the same job site.  Our foreman asked him if he would come to work on Saturday, 9/23/00 and he said he would.

He did not show up for work on Saturday or Monday and his check was cut and a pink slip was issued.  Mr. Leadum did not contact our office until sometime Monday afternoon.

We have reported this incident to our insurance company.

I also called the State of CT Unemployment and was told that he is currently collecting unemployment.

If you need any further information please do not hesitate to contact me.

Thank you for your help in this situation.

Sincerely,

Donna Lee Smith
Office Manager

Case 3:01-cv-00378-TPS   Document 80   Filed 11/17/2003   Page 26 of 41

| PERIOD | HOURS | C O N T R A C T O R | DATE RECD | FUND |
|--------|-------|---------------------|-----------|------|
| 7/1999 | 24.00 | WATERBURY MASONRY FOUND. | 11/01/1999 | A |
| 8/1999 | 8.00 | KIEWIT CONSTRUCTION CO. | 9/13/1999 | A |
| 8/1999 | 39.50 | WATERBURY MASONRY FOUND. | 12/14/1999 | A |
| 9/1999 | 50.50 | KIEWIT CONSTRUCTION CO. | 10/13/1999 | A |
| 9/1999 | 182.50 | KIEWIT CONSTRUCTION CO. | 10/13/1999 | A |
| 10/1999 | 176.00 | KIEWIT CONSTRUCTION CO. | 11/09/1999 | A |
| 10/1999 | 38.50 | KIEWIT CONSTRUCTION CO. | 12/13/1999 | A |
| 11/1999 | 62.00 | KIEWIT CONSTRUCTION CO. | 12/13/1999 | A |
| 12/1999 | 56.00 | BBL-CARLTON, LLC | 1/13/2000 | A |
| 1/2000 | 96.00 | BBL-CARLTON, LLC | 2/17/2000 | A |
| 2/2000 | 64.00 | BBL-CARLTON, LLC | 3/17/2000 | A |
| 9/2000 | 16.00 | CAMPUTARO LEASING, LLC | 11/29/2000 | A |

# LABORERS' INTERNATIONAL UNION
## of NORTH AMERICA - *Local Union No. 675*
### A.F.L. - C.I.O.



7 HARMONY STREET
DANBURY, CONN. 06810
Telephone: (203) 743-1407
Fax: (203) 778-5600

RICHARD BECKENBACH
BUSINESS MANAGER

March 28, 2002

I, Jimmy V. Ribeiro, SS# 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, residing at 1 Beaver Brook Road -- Unit 5, Danbury, Ct. 06810, phone # (203) 739-0346, on July 27, 2000, I reported to the union hall looking for work.

I was sitting in the waiting room talking to another Laborer, Dominick Neglia, telling him that my girlfriend was four months pregnant at the time and that I had to buy baby stuff. Mr. Leadum was in the room also listening to our conversation. Later on in the morning, the Business Manager received a phone call from the super at the C. H. Nickerson job asking for one Laborer at the Georgetown project.

The Business Manager called Mr. Leadum in and told him that he had a job and it was about 12 miles from here in Georgetown - Rt. 7, working for C. H. Nickerson. It was at this point that Mr. Leadum informed the Business Manager that there was a Laborer in the back room who really needed a job because his girlfriend was going to have a baby very soon and he would rather see him go. The Business Manager asked Mr. Leadum "Are you sure you do not want the job?" and Mr. Leadum's answer was "I would rather see him get it. I have other means and am financially well off. And besides, I want to take a trip".

So the Business Manager called me in and asked me if I would like to go to the Water Treatment Plant in Georgetown to work for Nickerson and I said I would. The Business Manager then made out the referral cards, I signed them and as I was about to leave the union hall, the Business Manager called me back and said

-2-

to me "I want you to thank this gentleman here because the job you are going to now was his job and he overheard you talking and asked me to give you the job instead of taking it himself. At this point, I said "Thank you very much", shook his hand and left.

At the present time, I am no longer a member of Local #675.

The above testimony is of my own free will and true to the best of my knowledge.


Jimmy V. Ribeiro

January 26, 2001

To: Richard Beckenbach
Business Manager
Laborers International Union
Local 675
7 Harmony ST
Danbury ,CT 06810

From: Robert Leadum
27 Chestnut ST
Danbury ,CT 06810

Dear Mr  Beckenbach ,

I want to be put on the inactive list. I feel at this time, I cannot accept your job offer
because many of the union members I met do not speak anymore and I feel that the union
is a hostile environment.

So I decline the job offer.

Thank you.

Sincerely,

Robert Leadun

Credit- 18⁰⁰ returned

**No. OS- 482364**   Local No. 675

City Danbury

Date 7/ 14   19 99

Robert LEADUM

New   Born 3-27-51   S.S. 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

27 Chestnut ST. Danbury Ct 0681

Six Hundred   Dollars ($ 600⁰⁰)

| INITIATION FEE $450 | BALANCE TO BE PAID $ ✗ | READMISSION FEE $ |

| | Feb. | Mar. | April | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6 mo | due | | | 22 | 22 | 22 | 22 | 22 | 22 | |

791-2156   Signature Jack Wanpole
OFFICIAL TITLE

A copy of Mr. Leadums Official Receipt dated July 14, 1999
it also shows the err on the date of birth, and disclaims
Allegations # 485- & 788   as to when Mr. Leadum started
work.

RICHARD BECKENBACH                23

2  and if there's an opening available, then the individual

3  can be sent.

4      Q.   Mr. Beckenbach, did Mr. Leadum come to you and

5  request to be sent to the training academy?

6      A.   Mr. Leadum asked one time about it, going to

7  the training academy, as he was sitting just as he close

8  as he is to me right now, in my office.  I said, "Well,

9  let me see."  I called up the training academy and asked

10 what they had going, and there were no classes available

11 at the time.  At that time, there were no classes

12 available at all.  I said, "Sorry, Bob, there's nothing

13 going on right now."

14     Q.   Shortly after, didn't two individuals --

15     A.   Oh, that was way after.

16     Q.   But why didn't you send Mr. Leadum if he had

17 made a request to attend?

18     A.   Because these two kids came in from Danbury

19 High School, two young kids.  I don't know if they ever

20 picked up a shovel in their life.  They wanted to know

21 if we had any work available.  And I said, "No, we have

22 nothing right at the present time."  And as they were

23 going out the door, I said, "Wait a minute.  Let me call

24 the training school just for the heck of it."  I says,

25 "Did any of you ever work -- do any kind of work, labor

1                    RICHARD BECKENBACH                24

2   work, anything physical?"

3             "No."

4             I said, "Well, this may be an opportunity.  If

5   they've got something open up there, you'll get an idea

6   of what construction is about, and maybe you'll find out

7   that this isn't for you."

8             So I made a call.  And they had an

9   apprenticeship program up there, general laborer stuff.

10  And the girl says, "I can put two of them in."

11            So I says to the kids, "There's two openings

12  up there, but this is a general course.  Nothing that

13  you take that you can get certified in."

14            It's just a general course that they have for

15  a general -- it's more or less to determine whether you

16  have the qualifications, more or less, to be a laborer.

17  It's set up as apprenticeship courses.

18       Q.   These individuals, did they pay the union

19  dues?

20       A.   No.  I just sent them up there.  I said, "When

21  you come back" -- it was a week course.  "When you come

22  back, you stop in and tell me, you know, how you liked

23  it."

24       Q.   But you had an individual that paid the union

25  dues, was ready and able to work, and also had asked you

1                          RICHARD BECKENBACH                    38

2        A.    The board.

3        Q.    Where is that board?

4        A.    The board was sitting right there.

5        Q.    Do you have a record that will indicate that

6   Mr. Leadum --

7        A.    The board is gone now.  Those things are gone

8   now.  So, I mean, Mr. Leadum knew he wasn't in line.

9        Q.    My understanding is that he was the next one

10  in line.

11       A.    No.

12       Q.    And didn't you make statement to him

13  indicating that he couldn't handle the 90-pound

14  jackhammer?

15       A.    This is after I sent the men out.  He says,

16  "Why didn't you send me?"

17            "Bob, you weren't next, and second of all, you

18  couldn't handle that job.  That's working on bridges

19  with a jackhammer at night."

20       Q.    How do you know he cannot handle that job,

21  Mr. Beckenbach?

22       A.    That is -- that was a type of a job -- it was

23  out in traffic.  Out in traffic.  But he wasn't in line.

24  I told him that he wasn't in line for that job.  That

25  had nothing to do with it.  He wasn't in line for that

1                    RICHARD BECKENBACH                    44

2    he's got 50 point hours -- 50 and a half hours.

3                    MR. FUSSELL:  Is that what it says?

4                    THE WITNESS:  Yes, 50.50.

5        A.    That was September.  Then, October, he worked

6    176 hours for Kiewit.  And also 38 and a half hours for

7    Kiewit in September.  November, he had 62 hours.

8        Q.    If he had worked the entire month of October

9    and November, how many hours per month, a regular

10   40-hour week, would it be?  Wouldn't it be 160 hours?

11       A.    But not on this job.  This job, you had to

12   work Saturdays.  Saturdays was mandatory on this job.

13       Q.    So when you're telling me in September, which

14   he was a full member at that time, he worked 50 and a

15   half hours, could you tell me why he didn't work 160

16   hours or more?

17       A.    Why he didn't?  Ask him.

18       Q.    No.  If you know, would you be able to tell

19   me?

20       A.    I can go to the steward's daily sheets and

21   tell you he took an exorbitant amount of time off the

22   job.  Even when he was foreman.  I made him a foreman on

23   the job.

24       Q.    Why did you do that?

25       A.    Why?  I got a request from the superintendent

RICHARD BECKENBACH                45

2  that they needed a foreman.  They were starting a crew

3  for the silt fence, and he wanted a foreman to be in

4  charge.

5          I said to him, "Jesus, I'd like to help you

6  out, Dave, but I don't have anybody available.

7          Then I said to myself, wait a minute.  I says,

8  "Remember the older fellow I sent you, Bob Leadum?"

9          He said, "Yeah."

10          I said, "Well, he has 15 years' experience."

11          And he told me --

12     Q.  Why did you tell him the older person?

13     A.  Because at that time I got about ten blacks on

14  the job.  So he would know who I meant.

15          So he says to me, "Yeah."

16          I said, "Well, he used to run jobs overseas,

17  and he told me he had 40, 50 guys in his crew

18  sometimes."  I said, "This would be a piece of cake for

19  him."

20     Q.  That job pays more?

21     A.  $2 an hour more.

22     Q.  Because of the supervisory responsibilities?

23     A.  Yeah.  So he would be making about $20 at that

24  time or $19.75, somewhere around there, you know, give

25  or take, above the rate.  Okay.

1                    RICHARD BECKENBACH              46

2          So I said to him, you know, "What about him?"

3          He says, "Hey, it's all right with me."  He

4     says, "Why don't you come down and talk to him."

5          I says, "All right."

6          I went down, and I got ahold of the steward.

7     Q.   You went down to the job?

8     A.   To the job site over here, yeah.

9          I got ahold of the steward.  I said, "Can you

10    get ahold of Bob Leadum?"

11         He says, "What's the problem?"

12         I says, "No problem.  If he wants, we're going

13    to make him a foreman."

14         So when Bob came in the yard, I called him

15    over to the side, and I said to him, I says, "Listen,

16    they need a foreman here for a silt fence crew."  I

17    says, "The crew will probably be between six, maybe nine

18    guys."  I says, "It would be a good job for you.  And

19    you don't work.  You just lead and direct the men.

20    Would you be interested?"

21         "Yeah, yeah."

22         I says, "And it pays $2 more an hour."

23         So I went over to the superintendent, and I

24    says to Dave, I said, "Dave, you know, Bob will take the

25    job."

RICHARD BECKENBACH                47

Q.    The superintendent -- I'm sorry.  But I'm not

familiar -- the superintendent is the superintendent of

the job or --

A.    The superintendent of the whole job.  They had

22 superintendents on that job.  That's why Bob was

confused.  The head one was Dave Weiley.

Q.    This was the top guy?

A.    This was number one.  His name was Dave

Weiley.

Q.    These people are not your members?

A.    No.  That's the company.  They're all Kiewit's

people.

I said to Dave Weiley, "Bob says, you know,

he'd give it to a try."

He said, "Fine by me."

Then Bob pulled me aside and says, "What's a

silt fence?"

Right then, when he said that, I knew he

never -- I says, "Boy, if you don't know" -- I says,

"Listen, don't worry about it.  It's like a snow fence.

You've got the hay.  You've got the black paper you put

up."  I said, "Don't worry about a thing.  The people

that are doing the work know what they're doing.  Just

play it by ear."  That's when I left.

1                      RICHARD BECKENBACH                48

2              Then I said to Tony, the steward, afterwards,

3       I said, "Jesus, I couldn't understand why he would say

4       that, what's a silt fence."  Because anybody that's been

5       around construction knows that you have to put silt

6       fences up, no matter what construction barriers there

7       are, to keep the erosion from running into streams or

8       going out into roadbeds or anything.  Even if it's a

9       flat piece of land, they put up -- it looks like a snow

10      fence.

11              Q.   Those are the square pieces of hay?

12              A.   Yes.  With the plastic on it so if the

13      mudslide comes up, it hits the hay, and it can't come

14      out.  And that was Bob's job.

15              Q.   Let me ask you.  During the months of

16      September, October, and November --

17              A.   One thing I forgot to tell you on this.  There

18      is a thing in the laborers' agreement that a foreman has

19      to have at least one or two years' experience.  One

20      contract for heavy equipment says two years' experience.

21              Q.   Where is that requirement?

22              A.   That's in the labor agreement book with the

23      contractors; that the laborers -- in order to be a

24      foreman, you've got to have at least two years'

25      experience.

1                    RICHARD BECKENBACH                    49

2        Q.    But you know that Mr. Leadum had more than

3    that because of the type of work he did?

4        A.    Only by word of mouth.

5        Q.    You don't verify --

6        A.    No.  But the part that I had to go over is

7    that he had to be in the union at least two years.

8        Q.    Why?  Why is that?

9        A.    Because if he wasn't in two years, how could

10   he have the experience?  You got to know.  Well, anyway,

11   I called up Tony that night and the whole executive

12   board -- I stuck my neck out, but I put him on.  I had

13   nobody available, so I wasn't really putting my head in

14   a ringer.

15            So I called up my executive board

16   individually, and I says, "Look, I had to waive the

17   foreman -- the years on the foreman to make a foreman

18   for Kiewit."  I says, "I put this guy on, but don't

19   worry about nothing.  He has got 15 years' experience.

20   He's sharp.  He knows what he's doing."

21            They said, "Fine, fine."

22            You see, there's also a thing in the union

23   that if the union can't supply within 24 hours, the

24   contractor has the right to go out and solicit, even a

25   nonunion guy.  It doesn't make no difference.  Because

1                      RICHARD BECKENBACH                    50

2      the job can't stop for nothing.  If the union can't

3      supply, then the contractor has the right to go out and

4      solicit.

5              Q.   And you won't have --

6              A.   We have no say.

7              Q.    -- a recourse?

8              A.   This goes for subcontractors.  Say, you needed

9      to have a concrete pour on Friday, and you wanted to

10     call Pumpco or one of them that does nothing but

11     concrete work and they're all busy.  Nobody could do it.

12     But you were behind on your job and you couldn't afford

13     to wait until next Friday or next Monday.  Then you have

14     the right to call a nonunion guy to come in and make

15     that pour.

16             Q.   So you lose --

17             A.   You lose your jurisdiction for that time.  If

18     it happens again, and you can't supply -- usually,

19     somewhere in the state, you can find somebody.  But

20     there are occasions when there's full employment, like

21     this year here (indicating) -- '99, 2000, there was full

22     employment in the State of Connecticut -- you couldn't

23     buy a man.  You couldn't buy a man.

24              On this job that he referred to in New

25     Milford, at New Milford High School, they couldn't get

                    GREATER DANBURY COURT REPORTERS

RICHARD BECKENBACH                    76

supers out there.  Maybe he'd feel bad, you know.  So he
stayed out and stayed out until he went to work for
BB&L.  Then he had an opportunity to go to work for
Nickerson, and he refused that.

Q.  Who is Nickerson?

A.  C. H. Nickerson.  I had the job -- no.  I'm
sorry.  This is just before he filed charges against us.
I think it was like a week or maybe two weeks before he
filed the charges against us.  They called for a laborer
out in Georgetown.

I said, "Bob that would be a good job for you
to go on."

Q.  Do you know if he refused because he was
threatened by some union members?

A.  No.  He wasn't -- at this time here, he hadn't
filed no charges, so he wasn't threatened by nobody
then.

Q.  Are you aware that he has been threatened by
union members?

A.  This is way after.

Q.  But are you aware that after he filed --

A.  No.

Q.  You are not aware?

A.  No.  Who were the union members?