UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT LEADUM,<br><br>_Plaintiff,_<br><br>v.<br><br>LABORERS' INTERNATIONAL UNION OF<br>NORTH AMERICA, LOCAL 675,<br><br>_Defendant._ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
3:01-CV-01779 (TPS)


December 8, 2003

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### FACTS

Plaintiff Robert Leadum joined Local 675 of the Laborers' International Union of North America in July 1999 when he was sixty-eight years old. At that time, he had worked as a laborer for over fifteen years, including work in construction and as a mason tender, when he helped lay sidewalks in Philadelphia in the 1980s. (_See_ Leadum Dep. at 226- 227.)

The Local is a hiring hall. When a contracting company needs workers, it will call the hall for referrals. Referrals are made on a "First In, First Out" basis. That is, there is a list of members' names and those at the top of the have been on the list the longest and are referred first. As workers complete assignments or are laid off, they are placed at the bottom of the list. (Compl. ¶¶ 13-14; Beckenbach Aff. ¶ 6.) At the time Leadum was an active member, the list was posted in plain view at the hiring hall. (Beckenbach Aff. ¶ 7.)

Over the course of his active membership, Leadum noticed that people lower on the referral list, who were younger than he, were being referred out ahead of him. (Leadum Dep. at

207-09.) He spent time at the union hall nearly every day—it was just around the corner from his home—and knew where he was on the list. (*Id.* at 194.) He would ask about work and be told that there were no jobs, and then he would see people coming out of the hall with referral slips. (*Id.* at 208.) He testified that, "I never saw my name go up on the list for availability for work." (*Id.*) He overheard conversations about who was getting referrals. Other times, he would see his name drop on the list. (*Id.* at 315.) Knowing that people with special skills and certifications for a particular job could be called even if they were not at the top of the list, Leadum would ask the Office Manager, Richard Beckenbach, what special skills or certification had been called for. Beckenbach never told him that the other workers had special skills. (*Id.* at 210.)

On several occasions Beckenbach's answers indicated that he believed Leadum was too old for the work. For example Beckenbach told him that "you and I can't do that kind of work," (Beckenbach is in his late sixties) and "we're old hens, they're looking for young bulls." (*Id.* at 233.) These comments were not isolated, but were made many times. (*Id.* at 233-35.) Leadum was being passed over for younger workers.

> [W]hen you question, you've got to think is it a racial thing. And then when you talk to the person who's in charge – and it appears it could be racial or it could be an age-related [thing] but when you talk to the person who's in charge of hiring and they state several times that they – when they speak, they, talking about contractors that get their supply of people or personnel from the union, that they want young bucks.

(Leadum Dep. at 238-39.)

Beckenbach's testimony essentially corroborates Leadum's. While he stated that he never told Leadum that he was too old for a job, he admitted that he would say, "they want young bulls." (Beckenbach Dep. at 33.) Beckenbach also admitted that he took Leadum's age

into account.  For example, after asserting that Leadum was not next in line for the request for the I-84 project, Beckenbach testified that he told Leadum that he "couldn't handle that.  That's working on bridges with a jackhammer at night. . . .  [I]t was out in traffic." (Beckenbach Dep. at 38.)  Beckenbach also testified that he told Leadum, "Bob, there's plenty of jobs that you can do, but the jackhammer is one you don't want, not out on 84, on a bridge." (*Id.* at 39.)  Significantly, he did not even know whether Leadum was qualified for the job.  (*Id.* at 40.)  Further, Beckenbach testified that even if Plaintiff had been next, he still would have discouraged Plaintiff from taking the job.  (*Id.* at 41.)  Other than Beckenbach's testimony that Leadum was not next, there is no evidence that Leadum was not next in line.  (*Id.* at 41-42.)

Leadum is not the stereotypical "little old man."  Now seventy-two, he works forty hours a week loading and unloading trucks, stacking shelves, picking up cartons of paint, roofing materials, lumber, and the like.  (Leadum Dep. at 135-37.)  He exercises regularly and is in good health.  (*Id.* at 134.)

The International Union in their own magazine, published training opportunities for all union members.

On August 18, 2000, Leadum filed a charge of age-discrimination with the Connecticut Human Rights Office and the Equal Employment Opportunity Commission.  The charge first alleged that the Local engaged in age discrimination when it referred younger workers, who were below Leadum on the list, to a job on I-84.  The charge also alleged that, even though Leadum told Beckenbach many times that he wanted to go to training courses, younger workers were sent instead.

Upon receiving a copy of the charge, Beckenbach told Leadum he had to tell all the members about the charge and that they would not be happy.

> After filing the charge against – with Human Rights concerning the union, there became a hostile environment at the union hall and several times or one time Mr. Beckenbach said that – or words to that effect that I have to notify all union members in writing the action that you took against the union and they're not going to be too happy, I noticed many union people were not – no longer speaking. I was isolated. And I felt from [a] prior statement . . . from the treasurer, that anybody who harmed the union was going to get hurt pretty bad.

(Leadum Dep. at 273. *See also id.* at 276.) Members stopped talking to him; they would walk on the other side of the street, stared at him, and looked at him "like a reject." (Leadum Dep. 273-74, 278, 281.) He also was told to "watch his back." (*See* Leadum Dep. Ex. 11.) On a few occasions, Leadum went to the hall and saw that the lights were out in the back room. "That's where we go in the side door. I was kind of scared to go in. People [union members] were standing outside, didn't speak." (*Id.* at 274.) By January 2001, Leadum did not feel safe at the hiring hall and asked to be placed on inactive status. (Leadum Dep. Ex. 10.) Leadum is still afraid for his safety. (*See* Leadum Dep. at 136-37.)

Shortly after June 25, 2001, Leadum received his "right to sue" letter from the CHRO. This action was filed on September 14, 2001.

## ARGUMENT

I.    GENUINE DISPUTES OF MATERIAL FACT PRELUDE SUMMARY JUDGMENT IN THIS CASE.

   A.    Summary Judgment Standard

The standard for deciding a motion for summary judgment is well established. Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). Summary judgment is improper if the plaintiff's prima facie case, combined with sufficient evidence that a defendant's asserted justification is a pretext, allows a fact-finder to decide that the defendant illegally discriminated against the plaintiff. *Byrnie*, 243 F.3d at 102. *See also Holtz v. Rockefeller & Co.*, 258 F.3d 62, (2d Cir. 2001) (plaintiff need not establish that proffered justification is false to carry burden of proof on rebutting defendant's evidence).

B.    <u>This Case Presents Genuine Issues of Material Fact that Preclude Judgment in Favor of Local 675.</u>

This case presents several genuine disputes of material fact. The most significant dispute is that, while Beckenbach testified that Leadum was not in line for a referral to the I-84 project, he also testified that there is no record of who was where on the list. (Beckenbach Dep. at 38, 41.) Leadum, who was at the hiring hall four to five days a week, was keenly interested in where he was on the list. He would see other workers coming out the hall with referral slips, but would not see his name go up the list. Other times, he would see his name drop on the list. (Leadum Dep. at 194, 208, 315.) (Beckenbach also admitted in his deposition that he did not believe Leadum could handle the work because he would be out in traffic, working on bridges at night. (Beckenbach Dep. at 38-41.)) This dispute is material to the action because it forms the basis of the Local's position that it had a legitimate, nondiscriminatory reason for not referring Leadum to the job. For purposes of this motion, the dispute must be resolved in Leadum's favor.

The assertion that Leadum's employment history was "brief and problematic" (Def.'s Local Rule Stmt. ¶ 11), is in dispute as well. First, while at Kiewit, Plaintiff's work crew was recognized as being very good. (Leadum Dep. at 220-23.) Indeed, Beckenbach testified in his

deposition that he believed that, overall, Plaintiff performed satisfactorily.  (Beckenbach Dep. at 67.)

Local Defendant asserts that Leadum either took himself out of jobs or was simply fired. In fact, Leadum was laid off from his assignment at Waterbury Masonry—along with everybody else at the site—and returned to the hiring hall.  (Leadum Dep. at 146.)  He was also laid off from his assignment at BBL-Carlton.  (*Id.* at 188.)  The Local, in contrast, contends that Leadum requested his job at the BBL-Carlton site to be terminated because the worksite was too cold. (Def.'s Stmt. ¶ 13.)

The Local also contends that Leadum insisted on being laid off from the job at Kiewit.  In fact, Leadum was urged to take a lay-off from his assignment at Kiewit; it was not his idea or something he requested.  Tony Garcia, the Treasurer of Local 675 and shop steward at the site, told Leadum that he had to take a lay-off or he would be fired.  (Leadum Dep. at 167, 256.) When Leadum tried to find out why, Garcia did not want to talk.  Instead, he said Leadum should just "think about it."  (*Id.* at 168.)  Garcia also said, "I'll give you -- you can get unemployment and I'll sign everything for you and you go on your way."  (*Id.*)  Thus rather than asking for a lay-off, Plaintiff took the proffered lay-off instead of being fired.  (*Id.* at 169.)  Simply stated, Leadum was forced out.  (Leadum Dep. at 255-56.)

Finally, Leadum was sent home when he reported back to work after being injured on his assignment at Camputaro Leasing.  (Leadum Dep. at 246).  Leadum's hand swelled up on the first day when he operated a jackhammer for about nine or ten hours.  (*Id.* at 243-44.)  The statement in the letter from Camputaro's office manager to Beckenbach (Def.'s Ex. 5), that Leadum had a blister is false.  He went to the emergency room after work and brought a doctor's note with him when he returned to work.  The doctor's note advised "light duty" for him and

7

stated that he should not use his hand. (Leadum Dep. at 244-46.) The foreman told him there was no "light duty" work available and sent Plaintiff home. (*Id.* at 246.)

Local 675 also contends that Leadum declined referrals, including a referral back to Kiewit. (*See* Beckenbach Aff. ¶ 20.) Leadum testified that Beckenbach did not offer a referral to the Kiewit Company, and if any referrals had been offered, Leadum would not have turned them down. (Leadum Dep. at 192, 200.) Beckenbach also testified that Leadum did not want to go back to Kiewit. (Beckenbach Dep. at 75.) Leadum, however, testified that he never made such a statement. (Leadum Dep. at 192.)

These factual disputes are material to the case. By painting Leadum as a "problematic" employee, the Local hopes to bolster its case that it had a legitimate, nondiscriminatory reason for not offering Leadum the referral and to undermine Leadum's rebuttal that the reason was a pretext for discrimination. But the inference that Leadum was "problematic" cannot be drawn in the Local's favor on a summary judgment motion. Thus, Local 675's motion must be denied.

## II.  LEADUM CAN PROVE A PRIMA FACIE CASE OF AGE DISCRIMINATION.

Under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621—634, it is illegal for a labor organization "to discriminate against any individual because of his age" or to "fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities . . . ." *Id.* § 623(c)(1), (2). A prima facie case under the ADEA thus consists of the following elements: (1) the plaintiff belongs to a protected class (i.e., people over forty years old); (2) the plaintiff applied for a position for which he was qualified; (3) the plaintiff was subject to an adverse employment decision; and (4) the adverse employment decision was made under circumstances giving rise to an inference of unlawful discrimination. *See Byrnie*, 243 F.3d at 101. Defendant concedes that Plaintiff, now

seventy-two years old, is within the protected class. (Def.'s Stmt. ¶ 7; Def.'s Mem. in Support of Mot. Sum. J. at 8.) It disputes the other three elements.

A.    Leadum Was Qualified.

Establishing the second element, that the plaintiff was qualified, requires only a minimal showing that the plaintiff "'possesses the basic skills necessary for performance of [the] job.'" *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir.) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991), *cert. denied*, 534 U.S. 951 (2001)). Thus, an inference of minimal qualifications should be easy to draw. *Id.* (citing *Gregory v. Daly*, 243 F.3d 687, 695-96 (2d Cir. 2001)).

Leadum clearly possesses the basic skills of a general laborer. At the time he joined the union, he had extensive experience in the construction industry.

Consequently, Leadum has established the second element of his prima facie case.

B.    Leadum Was Subject to an Adverse Employment Decision.

Several times during Leadum's association with the Local, he would be passed over on the referral list. He testified that he would be at the hiring hall and see where he was on the list. Later he would find his name lower on the list. He lived close by the hiring hall and would see workers coming out with their referral slips. Several times when he went to hall, he would hear a request for workers come in, and other people would be called. (*See* Leadum Dep. at 194, 207-10, 315.)

An adverse employment decision is "one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' Examples of materially adverse changes include 'termination of employment, a demotion . . . a material loss of benefits, significantly

9

diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Terry*, 336 F.3d at 138. Under that definition, it is clear that being passed over for work referrals at a hiring hall constitutes an adverse employment decision.

C.    The Circumstances of the Adverse Decision Give Rise to an Inference of Discrimination.

When Leadum was passed over he would ask the office manager what was going on. Beckenbach, who also is an older man, would explain that "we're old hens, [the contracting companies] are looking for young bulls." (Leadum Dep. at 232-33, 307-08.) These comments were made in the context of the I-84 job. Similarly, as an example, when a request for several workers came from a nuclear power plant and Leadum was not referred, Beckenbach told him the job was seven days a week and ten hours a day and not for old guys like them. (*Id.* at 307-08.) He did not actually ask Leadum if he wanted the referral.

Essentially, Beckenbach made assumptions about what Leadum was able to do and how hard he could work. Leadum testified that Beckenbach "would say in a nice form, 'Oh Bob, you and I, we can't do that kind of work.'" (Leadum Dep. at 233.) These sorts of comments, including the "young bulls" comments, were not an isolated occurrence. (Leadum Dep. at 233-35.) Leadum has worked hard all his life and is in good shape. (Leadum Dep. at 240.) He is currently holds a full-time job with vigorous physical demands and exercises regularly. (Leadum Dep. at 135-37.)

In other words, the comments implying that Leadum was too old were made to explain why Beckenbach did not refer Leadum for particular jobs. Thus, for purposes of this motion, Leadum has established the fourth prong of his prima facie case.

10

III.    LOCAL 675's JUSTIFICATION FOR ITS CONDUCT IS A PRETEXT FOR DISCRIMINATION.

Local 675 contends that Beckenbach called people in the order their names appeared on the referral board or the request was for workers with special skills or certifications.    As discussed above, however, there is a genuine dispute of material fact as to whether Leadum was next in line.

This explanation is merely a pretext.  Beckenbach did not offer jobs to Leadum because he considered Leadum to be an old man like him.  On several occasions, when Leadum asked Beckenbach what was going on, Beckenbach's answers indicated that he believed Leadum was too old for the work.  For example Beckenbach frequently told him that "you and I can't do that kind of work," and "we're old hens, they're looking for young bulls." (Leadum Dep. at 233-35; 238-39.)  Beckenbach admitted as much.  He stated in his deposition that he never told Leadum that he was too old for a job; instead he would say, "they want young bulls." (Beckenbach Dep. at 33.)  Similarly, after asserting that Leadum was not next in line for the request for the I-84 project, Beckenbach testified that he told Leadum that he "couldn't handle that.  That's working on bridges with a jackhammer at night. . . .  [I]t was out in traffic." (Beckenbach Dep. at 38.)  Beckenbach also testified that he told Leadum, "Bob, there's plenty of jobs that you can do, but the jackhammer is one you don't want, not out on 84, on a bridge." (*Id.* at 39.)  Further, Beckenbach testified that even if Plaintiff had been next, he still would have discouraged Plaintiff from taking the job.  (*Id.* at 41.)  These comments rebut Defendant's claim that Beckenbach was merely following the order on the referral board.  Beckenbach was essentially making Leadum's decisions for him because he thought Leadum was too old.

Significantly, Beckenbach did not even know whether Leadum was qualified for the job. (*Id.* at 40.)  "Courts have recognized that an employer's disregard or misjudgment of a plaintiff's

11

job qualifications may undermine the credibility of an employer's stated justification for [its] decision." *Byrnie*, 243 F.3d at 103 (citations omitted). Thus Beckenbach's lack of knowledge is relevant to proving that Local 675's justification is a pretext.

In the Second Circuit, evidence supporting the fourth element of an employment-discrimination, that an adverse decision was made under circumstances indicating that a plaintiff was subject to illegal discrimination, may be used to rebut a defendant's proffered legitimate, nondiscriminatory reason for taking adverse action against a plaintiff. That is, the evidence supporting the fourth prong of a plaintiff's prima facie case may be used to establish a jury question on the question of pretext. *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (disparate-treatment case; citing *Hargett v. National Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.1996) and *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir.1998)).

Beckenbach's contemporaneous comments about Leadum's age and his unfamiliarity with Leadum's job qualifications both undermine the credibility of Local 675 proffered reason for not referring Leadum for the I-84 job. A fact-finder may reasonably infer that Beckenbach saw Leadum as an old man and treated him like one. That inference must be drawn on this motion. Consequently, Local 675 is not entitled to summary judgment on Leadum's ADEA claim.

IV.    LEADUM'S BREACH OF CONTRACT CLAIM PRESENTS FACTUAL QUESTIONS THAT CANNOT BE RESOLVED BY SUMMARY JUDGMENT.

Leadum's Complaint alleges that the Union breached its contract with him "[b]y failing to follow its own personnel policies and procedures on evaluating and providing equal employment opportunity to its employees." (Compl. ¶ 26.) Specifically, while the Union had a policy of following the "first-in, first-out" scheme for job referrals. However, by referring out

12

workers who were lower on the list than Leadum, the Union failed to follow its own policies and procedures.

The elements for a breach-of-contract claim are straightforward. The plaintiff must prove "formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Bouchard v. Sundberg*, 80 Conn. App. 180 (2003) (citing *Maloney v. Connecticut Orthopedics, P.C.*, 47 F. Supp. 2d 244, 249 (D. Conn. 1999)).

The referral system used by Local 675 was one of the benefits of joining the union. In other words, the Union offered referral services—pursuant to its referral policies—and Leadum accepted the offer by joining Local 675 and paying the required fees. Whether Local 675 breached its side of the bargain is a question squarely in dispute. Although Beckenbach insists that Leadum was not at the top of the list for the I-84 job, he admitted that at that time he did not keep a record of members' positions on the list. Instead, the referral board was magnetic and names were simply moved as referrals were made. (Beckenbach Aff. ¶¶ 6, 7.) For his part, Leadum monitored his position on the list and testified that he "never saw [his] name go up on the list" and had seen his name drop down on the list. (Leadum Dep. at 208, 315.)

Consequently, there are genuine issues of material fact as to whether Local 675 failed to live up to its promise to Leadum as one of its members. Because those questions cannot be resolved on a summary judgment motion, Local 675's motion for judgment on the claim must be denied. Fed. R. Civ. P. 56(c).

V.    LEADUM'S EMOTIONAL DISTRESS CLAIMS MUST BE RESOLVED BY A JURY.

Leadum's Complaint pleads both intentional infliction of emotional distress and, in the alternative, negligent infliction of emotional distress. (Compl. ¶¶ 27-28.) Specifically, Leadum alleges that the Union caused emotional distress "[b]y not allowing Plaintiff to enjoy the same

13

treatment afforded to other Union members and engaging in [a] practice of displacement." (*Id.* ¶ 28.)

A claim of intentional infliction of emotional distress consists of the following elements:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442-43, 815 A.2d 119, 126 (2003) (citations omitted).

The negligent-infliction claim is similar. It requires proof that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Id.* at 444, 815 A.2d at 127. Further, it is well established that emotional-distress claims may be raised in employment-discrimination cases. *See, e.g., Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 81-83 (D. Conn. 2000).

In this case, Leadum heard the treasurer of the union say that "anybody who harmed the union was going to get hurt pretty bad." (Leadum Dep. at 273.) When Beckenbach received a copy of the civil-rights charge he told Leadum—in what Leadum felt was a threatening manner—that he had to tell all the members about the charge and that they would not be happy. (*Id.*) Leadum noticed that union members would not talk to him anymore, they would walk on the other side of the street, stare at him, and look at him "like a reject." (Leadum Dep. 273-74, 278, 281.) He also was told to "watch his back." (Leadum Dep. Ex. 11.)

Leadum became afraid to go to the union hall. On a few occasions, Leadum went and saw that the lights were in the back room. Union members would be standing outside, but not

14

speaking to him. He was afraid to go into the hall. (*Id.* at 274.) By January 2001, Leadum did not feel safe at the hiring hall and asked to be placed on inactive status. (Leadum Dep. Ex. 10.)

The union's conduct, including the comments, the implied threats, stares, and other conduct were of such a nature that it was foreseeable that they would cause a reasonable person to be afraid and to suffer emotional distress. Leadum is still afraid for his safety. (*See* Leadum Dep. at 136-37.)

The severity of the distress and whether it was caused by the union's conduct are both questions of fact. Consequently, summary judgment should not be entered on Leadum's emotional-distress claim.

## CONCLUSION

For the reasons stated above, this Court should deny Defendant's motion for summary judgment.

THE PLAINTIFF,
Robert Leadum


BY: _____
José V. Martinez, Esq.
Law Offices of José Vivaldi Martínez
60 Old New Milford Road, # 3D
Brookfield, CT 06804
Tel.:    (203) 775-8664
Fax:    (203) 775-8453
Federal Juris No. CT15393

15

## CERTIFICATION

The undersigned certifies that a copy **of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment** was sent, first class and postage prepaid, this 8th day of December, 2003, to the following counsel of record:

John T. Fussell, Esq.
John M. Brown, Esq.
ROBERT M. CHEVERIE & ASSOCS., P.C.
Commerce Center One
333 East River Drive, Suite 101
East Hartford, CT 06108-4201


_____
José Vivaldi Martínez
Commissioner of the Superior Court

16